May it please the court. My name is Anthony Patek of Gut Ride Saphir, representing plaintiff appellant Brian Hastings. Mr. Hastings, the relator, is with us here today, as is my colleague, Seth Saphir. Welcome. I would actually like to try to reserve five minutes of time for rebuttal. Do your best. Yes. If the prior arguments are any indication, then I will fail spectacularly, but we'll see how it goes. Mr. Hastings is here today seeking reversal and remand of the district court's order dismissing his complaint under the False Claims Act. The allegations of the complaint are fairly straightforward. HUD placed a duty on the defendant banks to police Fair Housing Administration insurance applications for fraud, fraud involving price inflation, and seller-funded down payment assistance programs. I think we're pretty familiar with the facts, and you want to try to reserve some time, so let's start asking some questions here. I guess my focus is on the original source claim that your client makes. It seems like the complaint is devoid of any references to letters, that Mr. Hastings' asserts demonstrates that he was the original source of information, and I'm just wondering if that just alone in itself isn't grounds for the district court to have dismissed the complaint. Well, the first thing that I would say is, of course, one of the bases upon which we're seeking reversal of the district court's order is that they didn't give leave to amend, and I would point out that Mr. Hastings did supply information in his opposition to the motion that demonstrated that he had communications with HUD. But did he offer what new facts he would put in the amended complaint? Because I don't recall that. I think he did, Your Honor, and we called that out in our briefing. But that would establish that he was the original source within the meaning of the FCA? Well, okay, so the first thing we should probably do is clarify which original source inquiry it is that we're discussing, because there are, in fact, two. There are the 2012 allegations, and then there are earlier communications going back to 1997. And with respect to the 2012 allegations, there was investigation that was done by Mr. Hastings into solicitations to engage in price inflation by people who were looking to get involved in the seller-funded down payment assistant programs, and also investigation that he had done pulling together mortgage underwriting guidelines from the defendant banks that basically set forth what he deems to be an insufficient procedure of vetting and that basically make it clear that the banks treat mortgage applications that are coming through seller-funded down payment programs completely differently from mortgage applications that they themselves are going to be underwriting. And so I think much of his allegations about original source with respect to the newer facts that were put in the 2012 complaint stem from those investigations, which were done by Mr. Hastings. So, I mean, subsequently, I mean, the inquiry at the district court became whether or not Mr. Hastings could qualify as an original source, given that the inquiry that he did was external to the banks. And there, we think that, in fact, he does qualify as an original source under the proper version of the False Claims Act, which is the 2010 version of the False Claims Act, which removed the direct knowledge requirement and replaced it with a standard that simply required that he have knowledge that was available to him. And we believe that, well, I think the record establishes pretty clearly that his information was gathered independently of any of the prior public disclosures, because none of the prior public disclosures contained any of the information that he had added to the 2012 complaint. I also think that that information material adds. What's your best evidence and argument that he was the original source under either the pre-2010 or post-2010 standard? Well, under the post-2010 standard, I think it's basically what I was just setting forth, right? I mean, he's, I think, to me, where and... What are the 2012 disclosures specifically? So the 2012 disclosures were disclosures that were added to the complaint as appendices. So he had pulled together... Entries, which essentially had sellers who were going out and soliciting purchases of homes where they were saying, you know, we will sell this home for this price, but if you want to use a seller-funded down payment assistance program, we're just going to increase the price of the home to cover the donation that the seller's going to have to make, right? I mean, that is the type of fraud that HUD specifically said was a violation of HUD rules, and which it had placed a duty on the banks to police. And this was in the MLS information? It was in the MLS information. Now, why wouldn't that be a public disclosure? It doesn't fall within one of the statutorily enumerated categories of public disclosures. And so I think that's one thing that I would hope the panel would keep in mind. I think it's easy to misinterpret public disclosure in a way that makes it synonymous with anything that isn't confidential, or only known to the people who are engaged in the fraud, but that's not what a public disclosure is within the meaning of the False Claims Act. The False Claims Act basically has three categories. I mean, there are a set of government hearings that are enumerated, there are government investigations, and there are publications in the news media. And by 2012, though, it seems to me your problem, if you were going to skip ahead to 2012, is by then nothing that your client could have submitted to the government would materially add to what was already... I disagree with that. Well, because, precisely because, all of the sources that you just ticked through, there were congressional hearings, there was a GEA report, there was extensive news media coverage of exactly the practice that you just described. Am I wrong on that? By 2012. I'm not talking about back in 1997. I'm talking about by 2012. But I think the distinction is between generalized allegations that a type of fraud may occur, which is those are the types of things that were discussed in the government, versus specific allegations of fraud occurring, where you're actually identifying transactions, like specific transactions, where people are soliciting to engage in price fraud, and then later on, mortgages are being approved, insurance applications are being filed, and then later, actual insurance claims are being filed, seeking payment to cover for the losses that have been incurred because of the insufficient policing by the defendant banks. And I guess the analogy that I would draw is, I mean, as I'm sure all of you are aware, there are lots of False Claims Act cases that are brought for things like Medicare fraud, right? I mean, we all know that Medicare fraud occurs. I have no doubt there have been government investigations of Medicare fraud, but we don't conclude from that that the government is on notice of every single instance of Medicare fraud, and that key TAM cases are completely barred, simply because the government is not aware that a general type of fraud occurs. And that's the same... Do I understand that the nature of the claim here is, at least prior to the 2008 legislative changes, that even though HUD would allow these down payment assistance plans to be used, that the banks were not implementing proper safeguards and were certifying then that they had used proper safeguards? And I would note, and we list them in our briefs, that there are other cases like this that have gone forward, and some of them are cases that the government has prosecuted, and I think one of them, and I might be wrong on this, but Beezer, I think, is a case that actually was a key TAM relater that went forward that involved very similar types of claims. And I don't see why, I think that you can't really distinguish our case from those cases. It's the same thing. All of the public disclosures that have been made in this case had also been made in those cases, but it didn't bar those claims. Maybe those courts, I don't know what cases you're talking about, frankly, but maybe those courts are wrong. It's neither here nor there, it seems to me. We've got the statutory language before us. We have the disclosures your client made. I guess just run through your materially ads argument again, because I just thought of that as being basically insurmountable, given how much had already been exposed leading up through to 2012. I guess I would be with you if what you were saying is that there was some very general discussion of fraud in an amorphous sense that didn't drop down to the specific type of execution of the fraud that your client has now uncovered. And I guess that doesn't seem to me to be the case. Everyone knew exactly how the supposed fraud, and I'm doubtful that there was even fraud pre-2008, but everyone knew exactly how the supposed fraud was occurring. And all your client has done is come up with, well, hey, shock of all shocks, there's actually specific examples of exactly that kind of fraud occurring. So what? That doesn't add anything to what everybody knows. The focus of the government investigations and hearings prior to 2008 was on whether or not seller-funded down payment assistant programs per se were something that should be prohibited. And I want to be very careful. We're not saying that merely using a seller-funded down payment assistant program was a violation of the False Claims Act. But one of the big issues in all of those hearings was the fact that there was a potential for abuse. And when you go back through and you look at what HUD had said, what they basically said is, look, we're not set up to police this. We cannot do it. We don't have the manpower. We don't have the experience. We're going to rely on the banks to be gatekeepers, right? And that's essentially where the banks failed, and that's where the False Claims Act violation comes into play. And I guess the analogy is, you know, it's one thing to be told that there are foxes trying to get into a henhouse. It's a different thing altogether to be told that the guard dog that you sent out in front of that henhouse is in league with the foxes or has gone to sleep or has wandered off. And I think that's the distinction that we're trying to draw between what was going on in those earlier government hearings and what it is that Mr. Hastings is trying to bring to light, because it really goes to the actual practices that were implemented. It's not the general fact that, hey, in some cases where there are seller-funded down-system payment programs, there may be fraud. And again, like, I just, for me, I don't understand how the court can interpret the public disclosures as broadly as the banks are asking them to, without categorically prohibiting key TAM suits in a wide array of areas. Not just the specific one here, but things like Medicare fraud, you know, both in terms of overbilling, which is something we all know that goes on, or Medicare fraud by drug companies when they start selling things off-label, which is prohibited. I mean, that's another class of false claims where, I mean, we all know that it occurs. Hang on, hang on. Go back, though, to what was then disclosed in all of the true public disclosures under the terms of the statute that led up to 2012. Because I guess I thought it was disclosed that banks were approving loans and then certifying them to HUD, where it was known that the purchase price had been increased to account for the donation that was going to be made. I thought that's what everyone was talking about. I'm not aware of any specific statements in any of the government hearings where it was acknowledged that that was the case. But even if it were, I think that is still different from saying that the banks simply weren't implementing any procedures to properly police the practice, right? I mean, because even accepting what you say is true, it still seems to me that that could be nothing more than an acknowledgment that there was still some fraud getting through, which doesn't necessarily implicate the banks. So it seems to me that those two things are still distinguishable. I have only one minute left. So unless you really have something you want me to address, I'll just sit down. Thank you. Good morning, Your Honors. William Jay on behalf of the defendants. I want to skip straight to the 2012 submission and the allegations that the Relator has come up with. It's not even in the opening brief. It's certainly not in the complaint. And most importantly, it's not in the 2012 submission to HUD. If you look at the 2012 submission to HUD, which I believe begins at ER 47, you'll see that the allegation that the Relator makes there is that the guidelines, the lender guidelines, treat FHA mortgages and other mortgages differently in that they allow seller-funded DAPs for FHA-insured mortgages. And the Relator alleges that that violates a HUD regulation. That's the theory that he presented to HUD. It is a wrong theory, but it is also a theory that doesn't materially add to the prior public disclosures. Because if you look at the GAO report from 2005, you will see that, you know, this is at SDR 105, that it was well known that any loan purchased by Fannie Mae or Freddie Mac could not use a seller-funded down payment assistance program. It was well known that lenders were using this in FHA-insured mortgages, precisely because the nature of the FHA mortgage insurance program is to encourage lenders, by providing mortgage insurance, to write loans that they wouldn't write under other programs that weren't insured by the federal government. The Regulation 203.5c is a regulation that requires the same level of diligence in the sense that you are supposed to charge a loan to a lender, and you are supposed to check the information provided with the same rigor in insured loans and non-insured loans. But it is not a requirement to apply the same underwriting criteria, in other words, to accept the same sources of down payments for uninsured loans as for FHA-insured loans. That's just not a requirement. Now, my adversary said that their theory is not that all loans that were originated or were purchased by Fannie Mae or Freddie Mac, working with one of these seller-funded down payment assistance programs, is a violation of the False Claims Act. Well, that certainly is the theory that they've been advancing up until today, if you look at the allegations in the complaint, and in particular, what they allege about the number of violations. And indeed, if you look at what the prior counsel said at the hearing before Judge Pregerson, they said that this was a violation because, by their very nature, the use of a seller-funded down payment assistance program increases the sale price. And that was publicly disclosed. Well, I think they're just saying that in any transaction where the sale price was increased to account for the donation that's going to have to be made, that's always going to violate at least their reading of the prior HUD regulations because necessarily the home buyer is going to be obligated to essentially repay the down payment amount, right, through a higher loan amount. Well, let me just note parenthetically, that's not a repayment obligation as HUD uses the term. A repayment obligation would be impermissible under HUD rules, but that means an obligation to repay the gift to the person who gives it to you. That's different. I'm happy to come back to that, but let me deal with the rest of your question. If you look at the list of loans that is submitted in 2012 and that is appended to the complaint and that I took to be a list of these are the violations we are alleging, there's no allegation that the relator picked through those and identified an increase in sale price in any one of them. It is an allegation, indeed, if you look at the briefing filed below, SCR 198, what he said was that he'd gone through, he had a list of down payment assistance programs that he thought were violative. He correlated those. I think the word he used in his pleading is FHA insured mortgages that had gone into default and for which there was an insurance claim. And that's it. There's no allegation that there was any effect on the sale price in the origination of those mortgages. The point is that he hasn't pleaded that theory. He certainly didn't present it to HUD in 2012. And as a result, certainly adding that theory now isn't enough to get past Judge Pregerson's finding that he wasn't an original source. And I think that's true under any definition. If you look at the list of allegations, we've argued in our brief that the correct way to look at it is under the prior version of the statute. But I think what the decisions from other circuits that have considered pre-2010 amendment cases that were dismissed at 12b1, it has not been a problem to affirm those under the new definition under 12b6 if under either standard the relator's allegations would fail. We are happy to address the question of what the standard should be if the court would like. I just had a quick question. What's HUD's current position on DAPs right now? Can FHA insure a mortgage that was secured using a DAP? No, it can't. As of 2009, Congress had changed the law. And I'm glad you brought that up because it's an important point. There was controversy about whether DAPs were a good idea and even, indeed, whether they violated HUD regulations. But HUD had authoritatively decided that, no, they don't. They acknowledged that there were problems, most prominently that it might cause sellers to increase prices. And if you look at the 2007 rulemaking document, the very first page of the 2007 final rule, you will see that HUD said that its primary concern in attempting to put a stop to seller-funded DAPs was the possibility of price inflation that would then jeopardize the federal mortgage insurance fund when claims were made when the federal mortgage insurance fund was made. But HUD failed to do the rulemaking properly, which is significant on two levels. One, the fact that HUD acknowledged that it had to change the rules demonstrates that this was all perfectly lawful up until the change in the law. Otherwise, the change in the law would have been meaningless. And number two, Judge Carlton's decision in the Nehemiah case from the East District of California, I think, puts this well. HUD failed to acknowledge fully in its rulemaking just how thoroughly it had endorsed DAPs. Initially, grudgingly, but gradually, it came around to the view that DAPs, while they had problems, were a good thing because they promoted homeownership among low-income people who couldn't make a down payment. And they thought that they would deal with those problems in different ways, such as by charging a higher mortgage insurance premium to account for the risk. All of that was thoroughly out in the public domain. Mr. Hastings has, you know, been convinced for a long time that these, in fact, would be violations of the law. But the theory that he presented for why they violate the law in 2012 is one that HUD's never accepted. It's based on this 203.5C regulation. And that just doesn't add anything because everyone understood, including the GAO report, that different rules permissibly apply to FHA-insured mortgages and regular mortgages. Can I ask you, just going back to the pre-2009 world, if the seller says, I'll sell you this house for $100,000 if you can just pay me cash, basically, but if you're going to use, you know, one of these down payment assistance programs, I'll just jack it up to $103,000, that was legal under the then-current HUD regime? That was legal under the then-HUD regime. And I understand that that's controversial and lots of people thought that it shouldn't be legal under the HUD regime. But HUD understood that sellers were doing that. I mean, you know, just to rattle off a couple of pages, I mean, SCR-67 and SCR-113, I think, are good examples of that. And then 57 and 59, HUD acknowledged that these are not true gifts. So why was that legal? It was legal because of what HUD called a loophole in the rules. The seller can't provide a portion of the, two things, the seller can't provide a portion of the down payment, and also there's the repayment obligation. Let me come back to the repayment obligation in a moment. It was legal because under the way the Nehemiah and similar programs worked, and this is expressly blessed by HUD, it's in the IRS 501C3 application, which is at ER 311.3, the seller Nehemiah would give a gift to the buyer. The buyer would use that gift to close on that house. After closing, the seller would give a gift or a contribution or a fee or some combination of those things to Nehemiah. That money would then be used for some other transaction down the road. And HUD decided in a legal memo in, I think, 1997 or 1998, that that was okay because the seller wasn't actually providing a portion of that buyer's finances. And so that was a blessing. Lots of people thought that was a bad idea, a controversial interpretation, but HUD stuck to it throughout the 2000s. And, you know, it was publicly controversial, but because DAPs were helping to get low income people into houses for, you know, for which they couldn't afford the down payment, HUD decided to live with that. Let me talk about the repayment obligation for a moment. A repayment obligation is if your parents give you money toward your down payment, but they say, you've got to repay this, it's not good enough. Anytime someone gives you a gift toward the down payment, they have to provide a gift letter. A gift letter says there's no repayment obligation. Nehemiah provided such gift letters. SCR 54 talks about that. And those were correct because there was no obligation to the buyer, on the buyer, to repay Nehemiah. And there's an example in the record about this, so that if the transaction went through, the buyer's now got the house, and the seller doesn't give the contribution to Nehemiah, Nehemiah does not come after the buyer and say, give us our gift back. They may go after the seller based on a contract that they have with the seller when the seller wants to participate in the Nehemiah program, but that's different. And that means there's no repayment obligation, and that's why these programs were not unlawful under the HUD regulations. And so are you saying that pre, yeah, let's just say in the pre-2009 world, that HUD did know that sellers were basically just jacking up the price solely to account for the donation they were going to make? Yes. I mean, there were statistical studies done by the GAO and by a HUD contractor and by the HUD Inspector General's Office where they crunched data in HUD's possession, went through loan files, and concluded that that practice was in fact happening. I mean, indeed, the Indianapolis Star article from 1998, which is in the record, says that sometimes sellers do that. You know, in an article that's sort of touting the program as a good thing, but says sometimes sellers jack up the price in order to cover the fee. That absolutely was well-known. And the supposed obligation of banks to police that in individual cases, not only does that not exist in the HUD requirements, I mean, to the extent my friends have cited anything about this, there's an allusion to the HUD handbook, which requires you to have a quality control program, which requires you, after the fact, to go back and look at 10 percent of your loan files to make sure everything was done right. That's not the same thing as an obligation to police supposed price inflation in every single loan all the time. That would be a very difficult thing to do, after all, because sometimes sellers could offset it against the commission, something that Mr. Hastings, in one of his early letters, had said was permissible. In other words, the realtor suffers instead of the buyer. Perfectly permissible. Switch subjects just for a second here. Why aren't we assessing this under the Affordable Care Act amendments to the False Claims Act? You aren't, Your Honor, because not only are all the public disclosures before the Affordable Care Act, a number of the claims themselves, the supposedly false claims for mortgage insurance, are before the Affordable Care Act. And that puts this squarely within the holding of the Affordable Care Act. You say a number. What about those that happen after the Affordable Care Act? I think that's the right question to be asking. So the ones before the ACA, those are squarely covered by Hughes. After the ACA, this is the question left open by footnote four of Hughes Aircraft, which is, is it the disclosure or is it the claim? We think it's the disclosure, and we think that's compelled by the logic of Hughes Aircraft, because what Hughes says is that you can't reinstate previously foreclosed QUITAM litigation without running a foul of the doctrine against retroactivity. There has to be a clear statement. There is no clear statement here. No one argues that there is. And it would be reinstating previously foreclosed QUITAM litigation because under the old regime, this is publicly disclosed, Mr. Hastings is not an original source, and if Congress changes the law and says, essentially undoes those public disclosures and says now he can be an original source again, that's creating liability that had already been shut down by the public disclosures. Just like if the statute of limitations is run and Congress creates a brand new tolling rule that revives some potential claims, that too is retroactive. And that principle holds even if, as in this situation, the government itself can't do anything about it. Could always have pursued the case? Yes, absolutely. That's the holding of Hughes Aircraft. The government in Hughes Aircraft had said, well, we could always sue, so there's no retroactivity problem ever with changing the standards for QUITAM litigants. And the Supreme Court unanimously said, no, no, that's not right. You look at qualifications for QUITAM litigation separately as if it were its own cause of action, precisely because QUITAM litigants can bring cases that the government could not come into court and say, this was all illegal, illegal, illegal, when the government, as the Judge Carlton decision is a good summation of this, the government had been blessing this all along. Unless the court has further questions, I'm prepared to submit our case. Thank you very much. So, if I may, Your Honor, the first thing that I want to get out there is the assertion that we did not plead this theory until today or our reply brief or anything like that is simply false. I mean, the theory that we're arguing today was raised in our opening brief. I believe the arguments were also raised in the underlying district court papers. So that's just false. Likewise, opposing counsel's assertion that HUD had actually approved the practices that were saying violated HUD rules was okay is also false. And we cite in the brief a number of portions in the record. I'm looking at ER 91, 93, 101 through 310 and through 311, where we note that HUD consistently indicated that using seller funded debts violated HUD regulations if there was price inflation to cover the donation, quote unquote, of the down payment. And opposing counsel's position is completely at odds with the fact that there are cases where people were actually prosecuted for doing this, which are the cases that I referred to earlier in my arguments in the first portion of this hearing. The other thing that I wanted to touch on is the question of retroactivity. And I just want to note that it's pretty much black letter law that the date that the claim for payment is submitted to the government is the date that controls when the false claim was made for purposes of the false claim claims act. As we noted, there are a number of false claims that we've identified in the complaint that were submitted after 2010. The argument that the version of the false claims act that controls is the date of the public disclosures and not the date of the actual false claim is simply incorrect as a matter of law. But to be clear, you've asserted false claims for claims made prior to the Affordable Care Act and after the Affordable Care Act? No, the complaint did. Do we use two different standards then? Well, that gets into, I think, some of the arguments that we had about why the 2010 version should be applied retroactively. And I just want to admit, I mean, I understand that Hughes seems on its face like it's a high hurdle to this. But, you know, even Hughes acknowledged that there were situations where it was acceptable to apply statutes from the Affordable Care Act. And in fact, Hughes also acknowledges that there are some cases where statements are used retroactively even in the face or in the absence of an explicit statement that they should be. And one of those were changes that simply changed the fora where the case can be brought. And that is the situation here. We went through in our briefs how the law interpreting the false claims act differed in the different circuits. And I would point out that in the 8th circuit, the district, I'm sorry, Judge Preggerson's interpretations of both direct knowledge and the information that had been previously disclosed were interpretations that were rejected by the 8th circuit. So if this case had been brought in the 8th circuit as a key TAM suit, it would have been allowed to go forward or at very least it would not have been subject to dismissal on the same legal grounds that have been put forward by the banks. Thank you. Thank you for your arguments and presentations today. The case of Hastings v. Wells Fargo Bank is now submitted.
judges: Murguia, Watford, Vanaskie